Good morning. Brian Wolfe. May it please the Court, appearing on behalf of Appellants and Cross Appellees. Your Honors, I'm here principally to answer any questions that you might have concerning this matter. The principal position on behalf of Appellants is that the District Court correctly found that the defendant, Glenn Miller Productions, had violated the sub-licensing rule, but then improperly weighed conflicting evidence to find that the plaintiff's claims were barred by the doctrine of laches. I'm sort of interested in what you say you would permit within the scope of the license that Mrs. Miller originally granted. One orchestra, no records, no use of the name in advertisements. Just how far would you go? Your Honor, the course and scope of the conduct of the parties, the two principals who entered into the 1956 license agreement, Helen Miller, the widow of Glenn Miller, and David McKay Sr., who had been a legal advisor to Glenn Miller and to Helen Miller during that time, would show that the contemplated scope of the license was to operate one band, using the name Glenn Miller Orchestra, and that it could record music that originally had been recorded by Glenn Miller, or other music under its own label, Glenn Miller Orchestra, and that, frankly, it could sell merchandise, although I don't think it was contemplated at that time because merchandising in the late 50s provided that was limited to Glenn Miller Orchestra. Is that correct, Your Honor? Ukuleles? Probably would be more appropriate for trombones, but could be ukuleles, Your Honor, yes. And, in fact, until the death of Helen Miller and David McKay Sr., that's all GNP did, right? That's precisely the point, is that for over 30 years following the entry of the 1956 license agreement, the business that Glenn Miller Productions was involved in was the operation of one touring band under the name Glenn Miller Productions. During the entire lifetime of Helen Miller, who died in 1966, there was one band. During the entire time of the other principal to the agreement, David McKay Sr., there was one band. It wasn't until sometime in or around 1998, over 30 years after the 1956 license agreement was entered into, that Glenn Miller Productions apparently started expanding the scope of the type of the business that the company engaged in. Now, why shouldn't your clients have been aware of that? Principally, the reason they weren't aware of it, Your Honor, was because there was a 30-year history of Glenn Miller Productions conducting its business within the acknowledged and recognized scope of the 1956 license agreement. They had no reason to believe that sometime after this 30-year history, which they were well aware of because they had been in litigation in 1979 and 1980 with David McKay Sr. During the course of that litigation, there was one band using the name Glenn Miller Orchestra. When the underlying, I wouldn't call it the underlying litigation, but when the litigation from 1979 to 1980 was settled, the settlement agreement that was entered into, there was one band using the name Glenn Miller Orchestra. That was the business of the company. So there was no reason or expectation by the Millers that sometime thereafter, unbeknownst to them and without any type of notice or consultation, Glenn Miller Productions would then commence expanding the business. The Millers received shareholder reports, right? No, Your Honor. That's incorrect. The Millers received financial statements. Right. It's about a two-page document. They're attached in the record. And in the financial statements, it has a line item that says licensing. Glenn Miller, I'm sorry, Stephen Miller testified at his deposition and submitted a declaration of opposition to the motion for summary judgment in the district court that, number one, he didn't see the column referring to licensing, but it's just a line item. And, moreover, had he seen it, he would have just assumed that it was referring to income generated by the band, Glenn Miller Productions, under the 1956 licensing agreement. It doesn't refer to sub-licensing. It doesn't refer to merchandising income. And there was clearly conflicting evidence on that point, just what did or what does the reference on the financial statement to licensing contemplate? Did the financial statement include a P&L with line items of income? It's all one document, Your Honor. Okay. So it's a balance sheet and a statement of property? Yes. Do you believe there are any genuine issues of material fact in dispute in this case? In other words, are you asking us to reverse summary judgment in favor of them? And, Garrett, to you, are you asking it to be sent back to the district court? We're asking that it be sent back to the district court on the issue of the enforceability of the 1956 license agreement, in that the court found that the agreement was in existence, that Glenn Miller Productions had violated the terms of the agreement by entering into the sub-licensing agreement, but that because the Millers had purportedly sat on their rights for an extensive period of time, their claims against Glenn Miller Productions to stop the sub-licensing was barred by the Doctrine of Laches. As I recall, taking a class in equity some years ago, isn't the period of a laches a bar measured by the bar of the statute of limitations? That's an aspect that the court considers, yes, Your Honor. If it's a number of years, for example, if it's a six-year statute of limitations, then if there was a six-year delay in enforcement, that would be laches because it's an equitable doctrine, not a legal doctrine applied in this case, right? My understanding is that the court would consider the applicable statute of limitations in making that determination, but the issue of laches only applies in the trademark context, as this court has found in at least three separate decisions, the Gotthard v. Disney decision, the Brookfield v. West Coast Communications decision, and more recently in the Brother Records v. Jardine decision, is that the laches defense only applies, and I'm sure the court's familiar with its prior decisions, but only applies if there is a knowing permission or knowing grant waiver by the trademark owner. And in this case, although the court suggested there was actual knowledge, in getting to that point, the court weighed the evidence against the plaintiffs. Yes, Your Honor, that would be our position, that those issues should be submitted to the jury. I would just point out a couple of additional items. Number one, the district court, in applying the sublicensing rule to trademark and the publicity claims, applied it in a manner that's consistent with the law of the other general areas of intellectual property. It's consistent with the cases on copyright infringement, which likewise have stated that absent an explicit provision, a licensee may not enter into sublicense agreements. This court's decision in Gardner v. Nike, the court stated explicitly that an exclusive license, which we don't even have here, has the burden of obtaining the licensor's consent before it may assign its rights, absent explicit contractual language to the contrary. Likewise, this court's decision in Harris v. Eames Records was consistent with that in the copyright area. The Harris court also discussed the application of the sublicensing rule to the patent area. So all three areas of intellectual property law are consistent, that absent an explicit provision in the license agreement, a licensee may not enter into sublicenses without the approval of the licensor. And those courts discussed the rationale, but the principle rationale is that the licensor is entitled to monitor and police the means by which the trademark is being used, and so that it is not used in an improper fashion or a fashion that the licensor, therefore, which is the actual owner of the mark, would find to be detrimental in some fashion. Absent any additional questions from the Court, I would like to reserve my remaining time to respond to Appley's arguments or answer any additional questions that the Court may have. All right. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Sheldon Eisenberg, and I'm here with my colleague, Melissa Bonfiglio, and we are here representing Glenn Miller Productions. I wanted to address my comments to two specific issues, why summary judgment was appropriate here on the issue of latches, and I wanted to also address our alternative request that this Court affirm the judgment of dismissal as well on the merits. First, on the latches issue, the only assignment of error by the Millers in this case is that judgment has improperly resolved disputed issues of fact. There's no assignment of error that the latches factors were improperly applied. And in light of that, because it's well recognized, in fact, that constructive knowledge is sufficient to trigger the latches period, and that's in the Ninth Circuit cases of Jarrow, in the Cling case, and the Danjack case, and many, many other district court cases and many other cases throughout the country that say that constructive knowledge is enough to trigger the running of the latches period. Well, those are the facts that I think the judge did decide on summary judgment because he decided there was constructive knowledge glossed over actual knowledge, and that means he was deciding whether there was sufficient information out there available to the stepchildren. What are the names? Millers? Johnny and Stephen. Okay, Johnny and Stephen. Should have it made some sort of inquiry. That's right. The facts that give rise to the inquiry notice are undisputed, and therefore that's the assignment of error at page 20 of the opening brief is that the judge improperly resolved disputed issues of fact. There's no argument, Your Honor, that Judge Matz improperly applied the latches factors to those undisputed facts. Well, let's talk about the receipt of the financial statements. Yes. Okay. Wasn't that disputed? Didn't Steve say that he didn't receive them and didn't read them? And even if he had, he wouldn't know what the licensing line signified? I mean, just because you're licensing to the U.K. or London or whatever doesn't mean you have six orchestras and you're merchandising internationally. Right. Your Honor, there's no dispute about the first two parts of what you said. In fact, the testimony was undisputed that the financial statements were sent to the Millers and to their counsel. There's no dispute about that. They were sent. They were sent. There's a presumption of receipt in the Ninth Circuit. No, no. They were sent. What do they mean? Why were you on notice of your client's broader use? Judge Ward, let me get to your next point, which was Mr. Miller did say in his deposition, I did receive the 9394 statements from Glenn Miller Productions. So there was an admission of receipt of those earliest financial statements. Say it again. Oh, okay. And then what does it mean? What it means is that receipt of a statement of income at page 178 of the record, which says licensing U.K., licensing Europe, and it also has a line for recordings and record royalties, so there wouldn't be necessarily the confusion that licensing means, well, that's the record company money. There's a separate line item of income for the record company money. What that means is that a person of ordinary intelligence should have, at a minimum, been put on inquiry notice. These are people that are being represented by Gibson, Dunn, and Crutcher and Lavely and Singer. And, in fact, some of the statements went to Ms. Ben Porat at Gibson, Dunn, and Crutcher. But just explain to me why what was in the statements should have put them on inquiry notice. The fact that we were receiving income from licensing. That fact alone? That fact alone. Why? Their complaint in this case was that we're licensing our name, our trademark. Sublicensing. Well, and that's the other issue that we've addressed. There's actually no evidence that we engage in sublicensing. We own the Glenn Miller Orchestra trademark. That was registered in 1964. It was renewed in 1985. It became incontestable in 2003 without any objection ever from the Millers, and certainly without any objection from Helen Miller, who was alive when the trademark application was initially filed. And their complaint in this case is that we are engaging. They call it sublicensing, but the fact is when they point to the record of so-called sublicensing, all they point to is licensing agreements. There is no sublicensing in this case. That was the fundamental error that Judge Matz made when he started to address the merits, which is why I think it's proper to affirm on the merits as well. Judge Matz's opinion all of a sudden uses the word sublicensing, and it wasn't his invention, of course. The Millers used that term. But the agreements that are in the record and the testimony of David McKay Jr. that are cited both by the court and by the Millers only refer to licensing. So we injected into this case this whole notion of this sublicensing rule that doesn't belong here because there's no factual predicate for a court to apply that concept. So every use of the Miller name is controlled by the corporation? The use of the name Glenn Miller Orchestra. That's the only name that we license. We don't license the stand-alone name Glenn Miller, Your Honor. And we don't use the stand-alone name Glenn Miller on merchandise. So if merchandise is manufactured and you get a T-shirt, do you sell the T-shirt at the retailer? We sell the T-shirt at the concerts or on our website, and the T-shirts or the polo shirts or the caps, they all say Glenn Miller Orchestra or they say GMO. And there's no intermediary broker or factor? No. No, I think my client would wish that were the case because that means it would be a bigger market. But the market is sufficiently small and it's a relatively small, the merchandise is a relatively small portion of their income. That's just never an issue. So the point, Judge Wardlow, though, is that the law is really clear in the Ninth Circuit that it's constructive knowledge, which is enough to trigger the running of the laches period. It doesn't have to be actual knowledge. Constructive knowledge alone will do it. And when an entity engages in widespread, open, notorious conduct, there's also a rule that says people have to monitor the situation. And in this case, there's a real discord in the record because, on the one hand, the Millers say we didn't discover what was going on. On the other hand, the undisputed testimony is that they've been diligently policing the use of the Glenn Miller name since 1980, and, in fact, their opening brief puts it back one year and says they've been policing since 1979. And in 1988, in fact, among the many, many cease-and-desist letters that Lavely and Singer prepared on behalf of the Millers, we have one that goes out to South Africa because some poor fellow created a Glenn Miller Appreciation Society, and that person got a cease-and-desist letter. Here we are licensing, sending financial statements to them that say we license, we're merchandising openly. When you say licensing U.S., how would a reasonable person interpret that? A reasonable person would interpret that as saying that we are engaging in licensing. So wouldn't that be sub-licensing? Your sub-licensing rights that you received from Helen Miller. No, Judge Wartler. We are licensing our trademark, which we created. Glenn Miller Productions created the Glenn Miller Orchestra. It did not exist until Glenn Miller Productions created it. Those are two different things to me. Doesn't that make that statement somewhat ambiguous? Your Honor, even if it's ambiguous, it certainly would make a reasonable person ask a question about it. We never got a question, let alone a cease-and-desist letter, up until the filing of this lawsuit in 2003. Ten years later, certainly Ms. Ben Porat and her colleagues at Gibson Dunn would understand the concept of licensing in this context. We had a trademark. The trademark was known. It's a public record. And, in fact, when the Millers entered into the settlement agreement in 1980, that trademark had been registered for 15 years when they ratified and even expanded the original license agreement from 1956. So we have their extensive policing efforts. We have the financial statements that they got on a yearly basis starting in 1994. We have Stephen Miller's attendance at concerts where merchandise was being sold. He admits that he was there. He admits that he saw merchandise being sold. We have the Glenn Miller Orchestra website in open notorious operation since September 1998. And, importantly, Your Honor, and let's not forget about these critical facts, because not only does it show constructive knowledge, I think it also shows actual knowledge. And that should give this Court comfort on the latter's ruling as it did Judge Matt's, because there's extensive knowledge, extensive evidence here, which was undisputed, by the way, of actual knowledge. And what I'm referring to are, first of all, the Millers' licensing agreements with their own licensing agents. We have a licensing agreement with the Richmond Agency in 1994, which says that the rights being given to the Richmond Agency are subject to the senior rights of, and there's a list of entities, including Glenn Miller Productions, and it says the Orchestra's, plural, of Glenn Miller Productions. That's in a 1994 agreement, again, worked over by the Millers' counsel. This was not something on the back of a napkin. Counsel was involved in that agreement. Two years later, belying the notion that that was some stray typo, two years later there's an agreement between the Millers and CMG, their co-plaintiff in this case, and that agreement also has, as a reservation of rights that are being given to CMG as licensing agent, the senior rights of the orchestras, plural, of Glenn Miller Productions. So there's an awareness in 1994 and 1996 that there are multiple orchestras that are being operated by Glenn Miller Productions. Not only does that establish constructive knowledge, Judge Wartlow, I think it establishes factual knowledge, and there's no dispute about those documents. They were executed by the Millers. The authenticity, there's no issue with respect to those facts. And then we have that additional fact, which in this case where we're really archaeologists, we're dealing with documents that nobody can testify about and that there is no testimony on. But in 1980, we have a document in the record that Judge Matz refers to, which is a draft pleading created by the Millers' attorneys in New Jersey, and in that document it's describing what Glenn Miller Productions is. And it says, Glenn Miller Productions, which actually consisted of multiple bands, run throughout the country. I have the actual language. The Glenn Miller Orchestra, which actually consisted of several bands playing continuously since Glenn Miller's death throughout the world. And that is at the record at page 302. So in fact, it looks like the Miller children may have had more knowledge about what was going on with Glenn Miller Productions than David McKay, Jr., who only became involved in the company after his father's death in 1980. So there is evidence in the record that there were multiple bands playing already before 1980. And then speaking to the point that Mr. Wolfe raised, that the only thing we did before 1980 was to operate one orchestra. Fact is, it's undisputed, in 1961 we licensed the Glenn Miller name to a production company, Kaler Productions, which did a television show on CBS called Glenn Miller Time. And obviously there was a license given to CBS also to use the Glenn Miller name in the promotion of that show. We also lent money to a book publisher to have a book published. So there were other things that we were doing besides operating one orchestra. And I would also say on that point, the Articles of Incorporation could not be clearer when they say that among the activities authorized for Glenn Miller Productions is the operation of one or more orchestras directly or through others. That's what the Articles of Incorporation said in 1956. Helen Miller executes her license agreement two months later. In that context, I do not see how we could have a reasonable interpretation that that license agreement somehow precluded Glenn Miller Productions from licensing other orchestras to use the Glenn Miller Orchestra name. That just doesn't make sense in that context. So besides the affirmance, which I think we need on latches, because the facts giving rise to the inquiry notice are certainly undisputed, and again I think we actually have undisputed facts showing actual knowledge. So it's belts and suspenders on the latches ruling for us. It is important that we get a ruling on the merits too. And the reason why is because litigation between the Miller children and Glenn Miller Productions goes back over 30 years now. There was a series of three lawsuits referenced again in Judge Matz's opinion in the record in Los Angeles and New York and New Jersey. Glenn Miller Productions thought that its litigation with the Miller children was done once and for all with the 1980 settlement agreement. What was the subject of those lawsuits? The subject of those lawsuits involved Helen Miller's estate that was in Los Angeles where I think Dave McKay Sr. was an administrator of the estate. The New York case involved some real estate, I believe, Judge Hall, a trust that owned real estate. And the New Jersey case involved royalties from RCA. And there's a published New Jersey Supreme Court decision on that case. That was the one matter that didn't settle. And Glenn Miller Productions came out on the short end of a 4-3 decision, even though I think the Chief Judge's dissent is the most persuasive opinion. The New Jersey case, the Steve and Johnny one. Yes. And they got a judgment as to? Yes, they did. And it involved? Entailment as to royalties. That's right. There was a disagreement about how the royalties should be distributed, calculated. And it was a, if you bother to look at the opinion, it was a complex contractual issue. But in any event, the reason why Judge Metz was not able to rule on the merits in our favor was because he focused on this so-called sub-licensing rule, which just doesn't have a factual basis in this case. It's very easy just to check the citations that the Millers give to the so-called sub-licensing and that Judge Metz refers to, and you see there's no sub-licensing in this case. So the proper rule in this case, if we're not doing sub-licensing, if we're actually just licensing our own intellectual property, which is what we're doing, we're licensing our own trademark. How do we know that? What evidence do we look at to see that you're only licensing Glenn Miller Orchestra as opposed to anything else? The license agreements, Your Honor, that are attached to David McKay Jr.'s declaration that are in the record. Those license agreements are actually crystal clear and beautiful to show how we are avoiding sub-licensing because they say, Glenn Miller Productions hereby licenses you, licensee, to use the name Glenn Miller Orchestra, and then it makes the licensee acknowledge that the licensor, that we are the only ones that have the right to use the Glenn Miller name. So we are not in any way sub-licensing the ability to use the standalone Glenn Miller name. It's crystal clear from those license agreements that all we're doing is licensing our trademark, the Glenn Miller, our incontestable trademark, the Glenn Miller Orchestra. Yeah, but then they're going to use the Glenn Miller as part of the publicity, and they're going to use the Glenn Miller music, right? Well, they're allowed to do that, and there's no dispute that we're allowed to use the Glenn Miller music, Your Honor. That's another part of that license. The license that Glenn Miller Productions got was as to what exactly? The right, likeness, and the music library. Right, but if you're going to be one of six or seven or eight Glenn Miller orchestras, aren't you using all those things that were licensed to you as well? No, Your Honor, there's no evidence of that. The only evidence is that the licenses give the licensee the right to use the name Glenn Miller Orchestra. How could they, I mean, if they're going to perform under the name the Glenn Miller Orchestra, they're going to be using the Glenn Miller name for publicity and for the other things you were given. There's no evidence, Your Honor, there's no evidence that they used the Glenn Miller name. Then it's a reasonable inference, and why else get the license for the trademark? Well, Your Honor, they'd actually be violating the license agreements that are in the record. So you're giving a license that they can't use because they can't go out there and advertise the Glenn Miller Orchestra and play his music and use his likeness and all of that. Well, they don't use his likeness. Of course they can advertise the Glenn Miller Orchestra. That's the descriptive name of themselves, which they are properly using pursuant to the license. No, it doesn't make sense. And the issue about the music is just not an issue in the case. Everyone acknowledges that we have the right to use the music, and that's never been challenged. So when you get, Your Honor, a broad grant of rights, such as the grants we received not only from Helen Miller in 1956, but also from the Millers themselves in 1980, when they expanded the grant by making them in perpetuity, and they also made them exclusive in 1980. So the Millers in 1980 knowingly agreed that the Glenn Miller Productions would be the only entity authorized to operate a Glenn Miller Orchestra forever. And in that context, the cases such as the Boozian Hawks case, the Barch case, the Brown versus 20th Century Fox case that are all cited in our briefs, all say that the party seeking to put a limitation on a broad grant of rights has the burden of establishing that such a limitation was intended. That was the standard that Judge Matz should have applied when he was looking at the merits, but he never got there because he got hung up on the sub-licensing rule. Thank you. Thank you very much. I would just like to respond to a couple of those points during my rebuttal period. As the Court can see both from argument of counsel and from the briefs, there are conflicting facts. There are conflicting facts of what the Millers knew, when they knew it, what the financial statements show, how one would interpret those financial statements, and these conflicting facts were weighed by the District Court. They were weighed in a manner against the Millers, a party opposing the summary judgment in favor of the moving parties, and that's precisely the reason why we're hearing precisely the argument that we're making. Explain to me why the licensing that Glenn Miller Orchestra or Productions did was a sub-license. It was a sub-license for the reason that the only way Glenn Miller Productions obtained the rights originally to use the name Glenn Miller, which is in the name Glenn Miller Productions, is from the 1956 license agreement. And so they could use the name Glenn Miller and tack on orchestra to get a trademark that they wouldn't otherwise have been able to get. Correct. Because orchestra is not a trademarkable item. Correct, Your Honor, exactly. The only rights Glenn Miller Productions ever had and currently has are the rights granted through the 1956 license agreement. It all originates with that document. So why didn't the 1980 agreement change things when you made an exclusive license and settled that one case? The 1980 settlement agreement, which was entered on the record in court in New York, simply affirmed the 1956 license agreement, and the Millers went a step further and said they would not themselves operate or authorize another person to operate a band using the name Glenn Miller Productions. It doesn't constitute an exclusive license. It's a non-compete clause is what it is. It says we will not compete with you. Because I think there was a, I wasn't involved in the case, but I think there was an issue at the time that maybe the Millers would go out and either start their own band or license the rights to have a band that would compete with the one existing Glenn Miller band. And that's all the 1980 settlement agreement says. It affirms the 1956 license agreement. It says we will not compete with you. Getting back to the point that was raised by counsel for Appelese, again they're trying to make this distinction between licensing rights purportedly owned by Glenn Miller Productions versus sub-licensing. As I think Judge Wardlaw appropriately pointed out, those rights, the only rights that Glenn Miller Productions has with respect to the name Glenn Miller that it uses as part of its name, Glenn Miller Orchestra, arises from that 1956 license agreement. And entering into the license agreements with third parties can be nothing other than a sub-license. They don't own the rights. The owners of the rights are the Millers. They're a licensee who is in turn authorizing third parties to use that name in some fashion. So I think the record is reasonably clear. And as Judge Matz found in the district court, this was the activity that was engaged in by Glenn Miller Productions was sub-licensing. Now, one of the other issues that was raised by counsel was the issue of constructive knowledge and whether or not the Millers had constructive knowledge. And he went through some of the evidence that was considered by the court and is referenced in the court's opinion concerning constructive knowledge. He raised the issue of license agreements that the Millers had entered into with third parties to effectively merchandise the name Glenn Miller for different things, trombones, that sort of thing. In those license agreements, which are multiple-page agreements, and they're in the record, there's a schedule on the license agreement, and the schedule does refer to orchestras, plural. And Judge Matz reviewed that as being the basis, as he said, not of actual knowledge, but it suggests actual knowledge. Again, a finding that there was not direct actual knowledge by the Millers that there were orchestras. And again, that is subject to different interpretations. Number one, there's no evidence in the record that the Millers prepared those license agreements or their attorneys prepared those license agreements. There's no evidence in the record that the Millers were aware that on a schedule of a multiple-page agreement, one word referred to orchestras, plural, as opposed to orchestras, singular. More importantly, there's conflicting evidence in the record, as cited by the district court, in its opinion that would militate toward a finding that the intent of Helen Miller and David McKay, Sr. was to operate one orchestra. The court cites GMP's first board of directors meeting on April 25, 1956, David McKay, Sr. Then the chairman said, and this is a quote from the court's opinion, the main business of the corporation would be to own and operate a traveling orchestra, singular. So, again, we can rely on semantics. We can rely on whether a word orchestras was used in some document, versus relying on the actual board of directors meetings from 1956, when the corporation was formed, concerning what the purpose of the corporation would be, where David McKay, Sr. said specifically it would be to operate one orchestra. Again, my point is, and I'm sure it's apparent to the court, is there's conflicting evidence on this point. The court improperly weighed that evidence and ruled against the Millers in this case, and we suggest that that's reversible error. Any additional questions? I just have one comment. I'd like to thank both counsel for your briefing. In this case, they're among the finest I've had a patient to read since I came on the court. Thank you very much, Your Honor. It's a pleasure being before you. Thank you.
judges: Beezer, Hall, Wardlaw